# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**BRIAN LAX, TRACEY BURON-HAHNLEIN,
WERNER HAHNLEIN, and JEREMY
HADER, on their own behalf and on
behalf of all others similarly situated,**

       **Plaintiffs,**

**v.**

                                    **CIV No. 20-264 SCY/JFR**

**APP OF NEW MEXICO ED, PLLC,
f/k/a ALIGNMD OF NEW MEXICO,
PLLC, and LOVELACE HEALTH
SYSTEM, LLC,**

       **Defendants.**

## <u>MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS'
REQUEST FOR LIMITED DISCOVERY AND TAKING PLAINTIFFS'
MOTION TO REMAND UNDER ADVISEMENT</u>

This case arises from alleged over-billing practices by Lovelace Health System, LLC

("Lovelace") and APP of New Mexico ED, PLLC ("APP"). Plaintiffs are former patients who

sought treatment at a Lovelace facility and allege they were overbilled by APP, a company that

provides emergency room physician and nurse practitioner staffing for Lovelace facilities.

Plaintiffs filed a class action complaint against Lovelace and APP in the New Mexico Second

Judicial District Court on February 11, 2020. Doc. 1-1. On March 23, 2020, Defendant APP

removed the action to federal court, citing diversity jurisdiction under the Class Action Fairness

Act ("CAFA"). Doc. 1. Plaintiffs argue that the case should be remanded to state court because

Defendants have failed to establish that greater than $5,000,000 is in controversy and because

even if it were, the "local controversy exception" mandates that this lawsuit remain in state court.

Case precedent related to the amount in controversy weighs against Plaintiffs and the Court therefore rejects Plaintiffs' argument that Defendants have not established a sufficient amount in controversy for purposes of CAFA jurisdiction. Further, the Court finds that Plaintiffs have not met their burden to establish the local controversy exception applies. Nonetheless, the Court will provide Plaintiffs the opportunity to conduct limited discovery on the question of class citizenship. As a result, the Court takes Plaintiffs' Motion to Remand under advisement.

## BACKGROUND

Plaintiffs' proposed class includes "all New Mexico residents who, beginning four years prior to the filing of this lawsuit, were billed by APP for amounts greater than the in-network amount permitted by their insurance provider for medical services provided at Lovelace facilities." *Id.* ¶ 93. The Complaint brings claims for violations of the New Mexico Unfair Practices Act, conversion, willful breach of contract, unjust enrichment, and civil conspiracy. Doc. 1-1. In connection with Defendant APP's removal to federal court, Defendant Lovelace has filed a consent to removal. Doc. 6. Before the Court presently is Plaintiffs' Motion to Remand, filed April 15, 2020 (Doc. 25) and fully briefed May 13, 2020 (Docs. 29, 30, 35). The Court held a hearing on this Motion on September 3, 2020. Doc. 38. Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the parties have consented to me serving as the presiding judge and entering final judgment. Docs. 9, 14, 15, 16.

## ANALYSIS

The parties dispute two issues related to the CAFA: whether the amount in controversy is satisfied and whether the local exception applies. The Court will address each in turn.

### A.  Amount in Controversy

The CAFA grants federal courts subject matter jurisdiction over a class action when (1) "any member of a class of plaintiffs is a citizen of a State different from any defendant," 28 U.S.C. § 1332(d)(2)(A); (2) the proposed class consists of at least 100 members, 28 U.S.C. § 1332(d)(5)(B); and (3) the amount in controversy exceeds 5 million dollars, excluding interest and costs, 28 U.S.C. § 1332(d)(2). The parties do not dispute the existence of the first and second requirements: the class representatives are citizens of New Mexico while Defendant APP is a citizen of Tennessee and the proposed class is larger than 100 members. Doc. 25 at 2; Doc. 1 ¶¶ 2.01, 3.06 (Notice of Removal). The parties do, however, dispute whether the amount in controversy exceeds $5 million.

To establish that the amount in controversy exceeds $5 million, "the claims of the individual class members shall be aggregated . . . ." 28 U.S.C. § 1332(d)(6). This amount is not "the amount the plaintiff[s] will recover, but rather an estimate of the amount that will be put at issue in the course of the litigation." *Frederick v. Hartford Underwriters Ins. Co.*, 683 F.3d 1242, 1245 (10th Cir. 2012) (citation omitted).

Here, Plaintiffs request an unspecified amount of damages in their Complaint and challenge whether $5 million is at issue. As such, the removing defendant bears the burden to prove jurisdictional facts, by a preponderance of the evidence, that establish the amount in controversy exceeds $5 million. *Id.* at 1246. A defendant can make such a showing by

> contentions, interrogatories or admissions in state court; by calculation from the complaint's allegations[;] by reference to the plaintiff's information estimates or settlement demands[;] or by introducing evidence, in the form of affidavits from the defendant's employees or experts, about how much it would cost to satisfy the plaintiff's demands.

3

*Id.* at 1247. Once a defendant meets its preponderance of the evidence burden, "remand is appropriate only if the plaintiff can establish that it is legally impossible to recover more than $5,000,000." *Id.*

Plaintiffs and Defendants disagree on the calculation to determine the amount of actual or compensatory damages at issue in this matter. In the Notice of Removal, Defendant APP offers an affidavit executed by APP's Senior Vice President Andrew McQueen which provides data related to "out-of-network patients" sent to collections:

> In 2016, APP sent approximately 3,500 out-of-network patients accounts to collections, averaging $940 per account, for emergency medical services rendered at Lovelace hospitals in New Mexico. In 2017, APP sent approximately 3,200 out-of-network patient accounts to collections, averaging $1,005 per account, for emergency medical services rendered at Lovelace hospitals in New Mexico. In 2018, APP sent approximately 4,200 out of network patient accounts to collections, averaging $1,047 per account, for emergency medical services rendered at Lovelace hospitals in New Mexico. The value of the out-of-network patient accounts sent to collections for emergency medical services rendered at Lovelace hospitals in New Mexico between 2016 and 2018 exceeded $5,000,000.

Doc. 1 at 8, ¶ 3.09.

As Plaintiffs acknowledge, such calculation totals over $10 million. However, Plaintiffs assert that APP's calculation does not meet the preponderance of evidence standard because it is overly broad compared to the class definition in three aspects. First, "Plaintiffs are not suing for total amounts billed. Plaintiffs are suing for amounts overbilled." Doc. 25 at 3. For example, Plaintiffs explain that APP billed Plaintiff Brian Lax $1,484, but he only owed the in-network amount of $526.33. *Id.* He was therefore overbilled by $957.67. *Id.* at 4. Second, Plaintiffs assert that APP's calculation includes everyone billed at out-of-network rates, including "people for whom Lovelace is out-of-network with their health insurance, and people with no insurance at all," while Plaintiffs are only bringing claims "on behalf of persons whose health insurance treats

4

Lovelace as an in-network provider." *Id.* Third, Plaintiffs assert that APP did not limit its
calculation to New Mexico residents, as the class definition is limited. *Id.*

Citing *Frederick*, APP counters that Plaintiffs' objections are not relevant because
Plaintiffs' damages estimate does not bind it. Doc. 29 at 3 (arguing APP is not "constrained by
the limitations in Plaintiffs' complaint."). In *Frederick*, the plaintiff included in his complaint a
statement that he was seeking less than $5 million in total damages. 683 F.3d at 1245. Rejecting
the plaintiff's attempt to control jurisdiction through such language in the complaint, the Tenth
Circuit held that "a plaintiff's attempt to limit damages in the complaint is not dispositive when
determining the amount in controversy." *Id.* at 1247. The Court agrees that a defendant is entitled
to present its own evidence on the amount in controversy and is not bound by the plaintiff's
estimate in the complaint. *Id.* But this does not make the complaint irrelevant. To the contrary,
*Frederick* indicates that the amount in controversy should be determined through reference to the
allegations in complaint. *Id.* (holding that a defendant can meet the preponderance of the
evidence standard by "calculations from the complaint's allegations."). Given that *Frederick*
does not limit the Court from considering Plaintiffs' arguments, the Court now considers
Plaintiffs' three arguments in turn.

First, Plaintiffs point out that Defendants' figures come from amounts billed even though
Plaintiffs "are not suing for total amounts billed. Plaintiffs are suing for amounts overbilled."
Doc. 25 at 3. Defendants APP and Lovelace respond with similar initial arguments. Defendant
APP asserts that it has presented evidence to show that "the amount in controversy exceeds
$5,000,000 for claims involving out-of-network patient accounts sent to collections for patients
that received emergency medical services rendered at Lovelace hospitals in New Mexico." Doc.
29 at 2. Similarly, Defendant Lovelace points out in its initial argument that the average amount

APP allegedly overcharged the named Plaintiffs is $1,017.03, which is very close to the $1,000.31 figure Mr. McQueen determined to be the "average amount of 'out-of-network patient accounts [sent] to collections.'" Doc. 30 at 10. Neither of these responses address Plaintiffs' specific argument. Plaintiffs argue that Mr. McQueen added up the total amount APP *billed* out-of-network patients, not the total amount APP *overbilled* out-of-network patients. Because they are only seeking recovery of the amount they were *overbilled*, Plaintiffs argue, Mr. McQueen inflates the damages Plaintiffs seek.

Defendant Lovelace's second argument does, however, address this point. Based on figures related to the named Plaintiffs, Defendant Lovelace calculates that the amount overbilled is, on average, 75.4% of the total amount billed. *Id.* Applying that percentage to the total in Mr. McQueen's affidavit provides an amount in controversy of over $8 million. *Id.* at 11. Therefore, Defendant Lovelace argues, even assuming Mr. McQueen's affidavit accounts for all billing and not just the over-billed amount, the amount in controversy still exceeds $5 million. *Id.* ("whether 'out-of-network patient accounts [sent] to collections' is the same thing as the amount of 'overcharges' or the amount of alleged overcharges is 75.4% of the amount billed, Mr. McQueen's declaration and the Plaintiffs' allegations clearly demonstrate that [the] amount in controversy exceeds $5 million."). The Court agrees with Defendant Lovelace that it is appropriate to look at the average amount the named-Plaintiffs (who must be representative of the overall class) were allegedly overbilled to arrive at an estimated percentage for which the entire class was allegedly overbilled.

Having established this percentage, the next question is against what number should this 75.4% be multiplied? Plaintiffs' second and third arguments assert that Mr. McQueen's figures include billing to individuals who cannot legally be part of the class, including non-New Mexico

residents and "people for whom Lovelace is out-of-network with their health insurance, and people with no insurance at all." Doc. 25 at 4. In contrast to the larger group on which Mr. McQueen bases his figures, Plaintiffs assert they are only bringing claims on behalf of New Mexico residents "whose health insurance treats Lovelace as an in-network provider." Doc. 25 at 4. In other words, Plaintiffs point out, not everyone who is treated at a Lovelace medical facility is a New Mexico resident or has health insurance that treats Lovelace as an in-network provider. Some patients go to a Lovelace medical center despite the fact that their health insurance does not consider Lovelace an in-service provider. Other individuals who have no health insurance at all, but still need medical treatment, might also go to a Lovelace medical center. Indeed, Mr. McQueen's affidavit only specifies that Lovelace sent approximately 10,900 out-of-network accounts to collections, without stating if those accounts were linked to New Mexico residents whose insurance billed them higher than the allowed in-network amount. Doc. 1-3.

That Mr. McQueen's figures allegedly include individuals who do not fit within Plaintiffs' class definition leads to the question of whether, in determining the amount in controversy for purposes of federal jurisdiction, must those who do not fit within the class definition be disaggregated from those who do? The Tenth Circuit case of *Hammond v. Stamps.com, Inc.*, 844 F.3d 909 (10th Cir. 2016) provides guidance in answering this question. The plaintiff in *Hammond* signed up for an account with Stamps.com, thinking she would only be charged for the months she actually used its services. 844 F.3d at 910-11. Instead, Stamps.com charged her a monthly subscription fee. *Id.* at 911. When the plaintiff discovered the monthly charge, she canceled her subscription and brought a proposed class action lawsuit "on behalf of everyone in the country who, like her, called to cancel their subscriptions after 'discovering' that Stamps.com 'was taking money from them' every month." *Id.* The plaintiff

contended she was entitled to $300 in statutory damages while others in the class would likely receive damages amounting to $31.98, or two months of subscription charges. *Id.* Upon removal, Stamps.com presented declarations showing that 312,680 people called to cancel their subscription in the relevant time period. *Id.* The district court granted remand, finding that Stamps.com failed to "disaggregate from the total number of customer cancellations those customers who 'felt duped' by Stamps.com's website disclosures." *Id.* In other words, customers could have canceled their accounts for a number of reasons besides feeling deceived, and Stamps.com failed to establish how many of the 312,680 customers canceled because they were deceived. *Id.* As such, the district court held that Stamps.com failed to satisfy its burden to establish the $5 million in controversy requirement. *Id.*

On appeal, the Tenth Circuit reversed the district court, explaining that the term "in controversy" requires "a party seeking federal jurisdiction to show only . . . that 'a fact finder *might* legally conclude' that damages exceed the statutory amount." *Id.* at 912 (emphasis in original). With that in mind, the court reasoned that "by everyone's admission, actual damages run at least $31.98 and perhaps $300 per person (before punitive damages). And as everyone, acknowledges, at least 312,000 people cancelled their subscriptions during the class period," which "leads to the possibility that a jury might lawfully award relief between nearly $10 million and $93 million." *Id.* Even if the plaintiff would be unlikely to show that all approximately 312,000 people cancelled their accounts because of misrepresentation, "no one has identified any legal impediment precluding a jury from finding all 312,000 persons entitled to relief," and therefore plaintiff might be able to lawfully recover for all 312,000 persons. *Id.* The Tenth Circuit concluded that the district court erred in focusing on what was "factually probable" rather

than on what was "legally possible." *Id.* at 913. The *Hammond* court further admonished that the jurisdictional test should not "bog[] [cases] down in mini-trials before they've even begun." *Id.*

In advance of oral argument in the present case, the Court directed the parties to be prepared to discuss the impact of *Hammond*. Doc. 37. In attempting to distinguish *Hammond*, Plaintiffs seized on the Tenth Circuit's distinction between "factually probable" and "legally possible." Plaintiffs' argument begins with the premise that it is *legally impossible* for a person who does not meet the class definition to recover in this class action. Patients who are out-of-network, uninsured, or not New Mexico residents do not meet the class definition. Therefore, Plaintiffs argue, it is *legally impossible* for them to recover any money in damages. Thus, under *Hammond*, to the extent Mr. McQueen's figures include billing to out-of-network, uninsured, or non-New Mexico residents, Plaintiffs assert the Court must not consider those amounts.

So, how much must the Court deduct from Mr. McQueen's figures? Plaintiffs acknowledge they do not know but point out that Defendants carry the burden of proof and it is Defendants who best know which of its patients were out-of-network, uninsured, or reside outside of New Mexico. Thus, Plaintiffs argue, Defendants had the ability to exclude from its estimate of possible damages all bills sent to patients who were out-of-network, uninsured, or not residents of New Mexico – patients who do not fit the class definition and so have no possible legal avenue for recovery. Defendants' choice to group those for whom recovery is legally impossible with those for whom recovery is factually possible, Plaintiffs contend, fails to carry their burden to establish an amount in controversy that is in excess of $5,000,000.

Plaintiffs' argument has logical appeal. In fact, Plaintiffs' argument mirrors the district court's rationale in concluding that the defendants in *Hammond* failed to establish an amount of controversy in excess of $5,000,000. The district court in *Hammond* considered the proposed

9

class – "all residents of the United States of America who were required to telephone Defendant to cancel their account after discovering Defendant was taking money from them," – and concluded that the proposed class did not include "customers who canceled their accounts for other reasons, such as not liking Stamps.com service, deciding they no longer need the service or that it is too expensive, or transferring to one of Stamps.com's competitors." *Hammond v. Stamps.com, Inc.*, Civ No. 15-605 JCH/SCY, 2016 WL 8905293, at *3 (D.N.M. Sept. 23, 2016). Thus, the unknown number of customers in *Hammond* who cancelled their accounts because they did not like Stamps.com's service or thought the service was too expensive are similar to the out-of-network, uninsured, or non-New Mexico resident patients billed in the present case. Although they do not meet the class definition, the defendants accounted for them in estimating possible damages.

Applying rationale similar to the rationale of Plaintiffs in the present case, the district court in *Hammond* noted that the defendant did not specify "what percentage of those 312,680 customers who canceled their accounts did so after discovering Defendant was taking money from them, versus how many canceled for any of a myriad of other possible reasons," even though that information resided in the defendant's exclusive control. *Id.* As such, the district court held that it could not determine if the putative class "would have 1,000 members or 100,000 members," and the defendant had therefore failed to meet its burden to show the amount in controversy exceeded $5 million. *Id.* Absent the Tenth Circuit's decision in *Hammond*, the Court would likely reach a similar conclusion.

But the Tenth Circuit in *Hammond* reversed the district court. In so doing, it faulted the district court for requiring the defendants to "disaggregate from the total number of customer cancellations those customers who 'felt duped' by Stamps.com's website disclosures." 844 F.3d

10

at 911. Instead, the Tenth Circuit held that it was legally possible for all 312,680 persons to recover damages, even if factually unlikely. *Id.* at 912. Significantly, despite the district court's observation that an unknown number of the 312,680 customers identified would not meet the plaintiff's class definition, the Tenth Circuit concluded that "no one has identified any legal impediment precluding a jury from finding all 312,000 persons entitled to relief." *Id.*

In so doing, the Tenth Circuit made clear that, despite it being a defendant's burden to establish by a preponderance of the evidence a jurisdictional amount in controversy, if it is *factually possible* that persons in an identified group could meet the class definition in a number sufficient to establish the amount in controversy, the defendant has carried its burden. *Id.* at 912. In reaching this conclusion the Tenth Circuit appears to have considered a number of policy factors. These factors include that the term "in controversy" historically means only that a party seeking federal jurisdiction show what "a fact finder *might* legally conclude"; that cases should not be "bog[ed] down in mini-trials before they've even begun"; that the defendant should not be tasked with arguing against its own interest and proving its "likely liability," just to secure federal jurisdiction; and that a more aggressive inquiry would "invite delays and costs more appropriately reserved for adjudicating the merits than choosing the forum." *Id.* at 912, 913.

Similar to the potential class in *Hammond*, in this case it is factually unlikely that all 10,900 patients in Mr. McQueen's affidavit will be members of the class, i.e. New Mexico residents whose insurance treated Lovelace as in-network. But, it is legally possible that all 10,900 patients could be New Mexico residents whose health insurance treated Lovelace as in-network but were billed an amount greater than the in-network amount. Because all 10,900 patients *might* qualify as class members (even if unlikely), this case is like *Hammond* where all 312,680 customers who called in to cancel their subscriptions *might* have done so because they

felt duped. Although Plaintiffs are correct that it is legally impossible for non-New Mexico residents and uninsured or out-of-network patients to recover because, by definition, they cannot be part of the proposed class, in *Hammond* it was also legally impossible for those who canceled their Stamps.com account for some reason other than feeling deceived to recover damages because, by definition, those people could not be members of the class. Yet, the Tenth Circuit did not require the *Hammond* defendant to disaggregate those who specifically fit the class definition from those who cancelled their accounts for a reason not included in the class definition. *Id.* at 912. This is because, the Tenth Circuit held in a binding opinion, it was legally possible that all 312,680 people who cancelled their subscriptions could be in the class, even if factually unlikely.[1] *Id*. Applying this rationale to the present case, it is legally possible that all 10,900 patients could be members of the proposed class, even if factually unlikely.

Following the reasoning in *Hammond*, the Court concludes that it should multiple 75.4% (the average amount overbilled to the named Plaintiffs) by the total for out-of-network patient accounts sent to collections for all 10,900 patients included in Mr. McQueen's affidavit. Such calculation totals over $8 million. Accordingly, Defendant APP has met its burden to establish that over $5 million might be at issue.

Plaintiffs' Complaint also asks for punitive, treble, and statutory damages and attorney's fees.[2] Doc. 1-1 ¶¶ 105, 111, 118; Doc. 1-1 at 13. The preponderance of the evidence standard

---

[1] The Tenth Circuit did not address what a plaintiff must do to overcome this inference of legally possible (provide a handful of examples of individuals who do not meet the class definition; identify a sufficient number of persons who do not meet the class definition to bring the amount in controversy under the $5,000,000 threshold; etc.). Neither does this Court.

[2] The Complaint also seeks injunctive relief and disgorgement. Doc. 1-1 ¶¶ 106, 122. While both can be considered towards the amount in controversy, *see Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir. 2006), neither Defendant addresses such damages. Because the

"must be applied to all damages counted toward the total amount in controversy, including punitive damages." *Frederick*, 683 F.3d at 1247. "A defendant seeking to remove because of a claim for punitive damages must affirmatively establish jurisdiction by proving jurisdictional *facts* that ma[ke] it *possible* that punitive damages are in play." *Id.* at 1248 (quotation omitted) (emphasis in original). "The defendant does not have to prove that the plaintiff is more likely than not to ultimately recover punitive damages, but merely that: (1) state law permits a punitive damages award for the claims in question; and (2) the total award, including compensatory and punitive damages, could exceed $5,000,000." *Id.*

Regarding APP's assertion that Plaintiffs seek treble damages under the UPA (Doc. 29 at 6), the Court notes that, although the UPA allows treble damages for the named plaintiffs, it does not provide treble damages for members of a class action. NMSA § 57-12-10(B), (E). Because combining and then trebling the damages of the named Plaintiffs is unlikely to exceed even $20,000, the availability of treble damages for the named Plaintiffs does not significantly factor into the Court's analysis of whether more than $5,000,000 is in play.

The Court does, however, factor in Plaintiffs' request for punitive damages. During the oral argument on September 3, 2020, Plaintiffs linked their argument on punitive damages to their argument that Defendants' damage estimates include individuals from whom it is legally impossible to recover. Although Plaintiffs acknowledge damages in this case could include a multiplier of some amount within the Constitutional boundaries for punitive damages, Plaintiffs argue that by wrongly including an unknown number of out-of-network insureds, uninsured, and non-New Mexican residents in their estimate of possible damages, Defendants provided

---

Defendants present no evidence on the value of an injunction or disgorgement, they have not met their burden and the Court will not consider either in determining the amount in controversy.

insufficient information to estimate damages. Therefore, the Court cannot determine the number

to which a punitive damage multiplier should be applied. Although this argument would have

force if Plaintiffs succeeded on their "legally impossible" argument discussed above, the failure

of Plaintiffs' "legally impossible" argument also dooms Plaintiffs' punitive damages argument.

The question of *what* multiplier should be applied is much more difficult. The Supreme

Court "has been reluctant to identify concrete constitutional limits on the ratio between harm, or

potential harm, to the plaintiff and the punitive damages award; but, in practice, few awards

exceeding a single-digit ratio between punitive and compensatory damages will satisfy due

process." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 410 (2003). In cases such as

this, "when compensatory damages are substantial, then an even lesser ratio can reach the

outermost limit of the due process guarantee." *Id*. Because, following *Hammond*, the Court

assessed the amount of compensatory damages Plaintiffs might recover to be in excess of $8

million, the Court need not attempt to predict what punitive damage multiplier would butt up

against the Constitutional limits in this case.

Similarly, neither party offers an estimate as to the amount of attorney's fees that will be

at issue. *See Miera v. Dairyland Ins. Co.*, 143 F.3d 1337, 1340 (10th Cir. 1998) ("[W]hen a

statute permits recovery of attorney's fees a reasonable estimate may be used in calculating the

necessary jurisdictional amount in a removal proceeding based upon diversity of citizenship.").

Given the Court's determination that compensatory damages might exceed $8 million, however,

what attorneys' fees might be awarded is not a deciding factor and so the Court will not attempt

to estimate the amount of attorneys' fees that will be in play.

Based on just the compensatory damages at issue, the Court finds that Defendant APP

has met its burden to show that the amount in controversy exceeds $5 million. "Once a defendant

meets this burden, remand is appropriate only if the plaintiff can establish that it is legally impossible to recover more than $5,000,000." *Frederick*, 683 F.3d at 1247. Plaintiffs make no such showing and present no evidence of their own on the amount in controversy. For these reasons, the Court finds that the amount in controversy is satisfied and will not remand on this basis.

### B.  Local Controversy Exception

Even if Defendants establish a sufficient amount in controversy, Plaintiffs argue, this case should be remanded under CAFA's "local controversy exception." "CAFA was enacted to respond to perceived abusive practices by plaintiffs and their attorneys in litigating major class actions with interstate features in state courts." *Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1243 (10th Cir. 2009). Congress, recognized, however, that when it comes to "class actions with a truly local focus . . . state courts have a strong interest in adjudicating such disputes." *Id.* (quoting S.Rep. No. 109–14, at 39 (2005)). Therefore such cases "should not be moved to federal court under this legislation . . . ." *Id.*  At first blush, this case appears to be the type of case Congress had in mind when it drafted the local controversy exception. All of the medical centers at issue are located in New Mexico, the prospective class is limited to New Mexico residents, and, even though Defendant APP is not a New Mexico citizen, the APP billing at issue all relates to medical services provided in New Mexico.

Again, however, cases from the Tenth Circuit and other jurisdictions are not friendly to Plaintiffs' position. *See, e.g.*, *Woods v. Standard Ins. Co.,* 771 F.3d 1257, 1262 (10th Cir. 2014) (CAFA "should be read broadly, with a strong preference that interstate class actions should be heard in federal court if properly removed by any defendant"); *Reece v. AES Corp.*, 638 F. App'x 755, 767-68 (10th Cir. 2016) (because the local-controversy provision is a narrow exception, "all

doubts [are] resolved in favor of exercising jurisdiction over the case") (unpublished) (internal quotation omitted).

Under the local controversy exception, codified at 28 U.S.C. § 1332(d)(4)(A), four elements must be met for it to apply: (1) "greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed," here New Mexico; (2) "at least 1 defendant is a defendant from whom significant relief is sought," "whose alleged conduct forms a significant basis for the claims asserted," and "who is a citizen of the State in which the action was originally filed;" (3) the "principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed;" and (4) "during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other person." 28 U.S.C. § 1332(d)(4)(A). Plaintiffs bears the burden to show, by a preponderance of the evidence, that the exception to the CAFA is applicable. *Nichols v. Chesapeake Operating, LLC*, 718 F. App'x 736, 740 (10th Cir. 2018). Because Plaintiffs have, at this point, failed to establish the first element in this test, the Court does not analyze the test's remaining elements.

Regarding the first element, the primary case Plaintiffs rely on in support of its argument that it has demonstrated that "greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of [New Mexico]" is *State Farm Mutual Automobile Insurance Co. v. Dyer*, 19 F.3d 514 (10th Cir. 1994). There, the Tenth Circuit held that "the place of residence is prima facie the domicile." *Id.* at 520. Because Plaintiffs limit the proposed class to New Mexico residents, they argue that the Court should apply a "commonsense approach" to this issue. Doc. 35 at 5-6. In other words, Plaintiffs appear to argue that, given the

presumption that residence is prima facie the domicile, common sense dictates a finding that at least two-thirds of the New Mexico residents in the class will also be New Mexico citizens.

However, in an unpublished case, the Tenth Circuit already rejected such an application of *Dyer*. *See Reece v. AES Corp.*, 638 F. App'x 755, 772 (10th Cir. 2016) (unpublished). The *Reece* plaintiffs had defined their class to include "all citizens and/or residents and/or property owners' whose injuries occurred within LeFlore County [in Oklahoma]." *Id.* at 768. In arguing that they satisfied the first prong of the local controversy exception test, the plaintiffs argued that "*Dyer* supports their position that residence is sufficient to demonstrate domicile in the absence of a contrary showing." *Id.* at 771. Although the *Reece* court recognized *Dyer*'s holding that residence is prima facie evidence of domicile, the *Reece* court also recognized that *Dyer* did not address whether a party was a citizen of a particular state. *Id.* at 769, 772. Instead, *Dyer* considered whether a state could be *negated* as a place of citizenship. The *Reece* court reasoned that "[e]vidence that is sufficient to prove that a defendant is not a citizen of a given state is not necessarily sufficient to affirmatively prove that he is a citizen of a particular state." *Id.* More importantly, the court in *Reece* held that "residence alone is not equivalent of citizenship." *Id.*; *see also Nichols*, 718 F. App'x at 741 ("We agree with . . . this court's non-precedential decision in *Reece*, and other circuits that reject the applicability of a rebuttable presumption of citizenship in the context of a CAFA exception invoked based on the mere allegation of residence.").

The *Reece* court's holding that "allegations of mere 'residence' may not be equated with 'citizenship'" derives from its earlier published decision in *Whitelock v. Leatherman*, 460 F.2d 507 (10th Cir. 1972). *Id.* at 769 (quoting *Whitelock*, 460 F.2d at 414). As the *Reece* court pointed out, "a person is a citizen of a state if the person is domiciled in that state," and "a person acquires domicile in a state when the person resides there and intends to remain there

indefinitely." *Id.* The court further held that while "[a] pure inference regarding the citizenship of

prospective class members may be sufficient if the class is defined as limited to citizens of the

state in question," the plaintiffs had defined their class to include citizens, residents, and property

owners. *Id.* And "[b]ecause Plaintiffs did not include in their amended petition an unambiguous

limitation confining the class definition to Oklahoma citizens, they were obligated to do more:

they, perforce, had to marshal and present some persuasive substantive evidence (extrinsic to the

amended petition) to establish the Oklahoma citizenship of the class members." *Id.* Because

plaintiffs had failed to make such a showing, the court held that remand was not appropriate

under the local controversy exception. *Id.* at 770.

Plaintiffs argue that *Reece* is distinguishable on its facts. They focus on the Tenth

Circuit's statement that "[t]he difficulty in assuming citizenship based on residence or property

ownership becomes significantly greater here because the proposed class is not limited in time,

but rather embraces people who lived in, or owned property in, the class area within the last

twenty years." Doc. 35 at 6 (quoting *Reece*, 638 F. App'x at 768). The Court agrees that the

plaintiffs in *Reece* asked the court to make a far greater leap of faith than do the Plaintiffs in this

case. The class definition in *Reece* included citizens, residents, and property owners. 638 F.

App'x at 760. It seems logical that "property owners" could include many people who are

citizens of other states, but who own property such as second homes or rental homes in the state

at issue in *Reece*, Oklahoma. Plaintiffs' class definition in the present case is not so broad; it only

includes New Mexico residents. Additionally, the class in *Reece* was not limited in time. By

defining the class as "people who lived in, or owned property in, the class area within the last

twenty years," the *Reece* plaintiffs' citizenship argument clashed with the significant possibility

that an erstwhile citizen of Oklahoma may have moved from the state sometime in the preceding

twenty years. *Id.* at 768. Here, the class is limited in time to those residents who were overbilled for treatment at Lovelace between 2016 and 2020. Doc. 1 ¶ 93. As a result of these distinguishing features of *Reece*, the Court rejects Defendants' argument that the inference of citizenship Plaintiffs ask this Court to draw is similar to the inference the plaintiffs asked the court to draw in *Reece*.

Although the Court declines to extend *Reece* as far as Defendants suggest, *Reece* does have value to the Court's present analysis in two respects. First, the *Reece* court's treatment of *Dyer* is persuasive. *Reece*, 638 F. App'x at 772 (holding "[a] demonstration that the proposed class members are . . . residents of that state will not suffice in the absence of further evidence demonstrating citizenship."). For the reasons discussed above, *Dyer* does not compel the conclusion that the limitation of a class to the residents of a state means that at least two-thirds of the class are citizens of the state for purposes of CAFA's local controversy exception. Second, *Reece* cited with approval a published decision from the Seventh Circuit that is factually analogous to the present case: *In re Sprint Nextel Corp.*, 593 F.3d 669 (7th Cir. 2010).

The plaintiffs there alleged that Sprint conspired with other cell phone providers to impose artificially high prices for text-message service. *In re Sprint Nextel Corp.*, 593 F.3d at 671. "The plaintiffs declared that they were bringing the suit on behalf of themselves and 'all Kansas residents' who purchased text messaging from Sprint Nextel or one of its alleged coconspirators between January 2005 and October 2008, when the suit was initiated. But they also specified that their class was limited only to those who (1) had a Kansas cell phone number, (2) received their cell phone bill at a Kansas mailing address, and (3) paid a Kansas 'USF fee,' which is applied to all long-distance calls within Kansas." *Id*. The case came to the Seventh Circuit after the district court rejected an argument similar to the one Defendants now make:

plaintiffs failed to meet their burden under the first prong of the local controversy exception because they "presented no evidence that two-thirds of their proposed class members were in fact Kansas citizens, as opposed to, say, local offices of national corporations or out-of-state students at Kansas colleges, each of whom might have Kansas cell phones and Kansas mailing addresses." *Id*. Although the plaintiffs did not submit any evidence about citizenship, "the district court thought that the class definition itself, keyed as it is to Kansas cell phone numbers and mailing addresses, made it more likely than not that two-thirds of the putative class members are Kansas citizens." *Id.* at 673.

The Seventh Circuit recognized that this common-sense approach "has some appeal." *Id*. After all, "[p]eople with Kansas cell phones presumably have them because they lived or worked in the state at some time, and the current Kansas mailing addresses suggest that they still do." *Id*. And even though some people have Kansas cell phone numbers because they work there, but do not live there, "one would think that the vast majority of individual Kansas cell phone users do in fact live in that state and that the vast majority of them view it as their true home." *Id*. The Seventh Circuit also acknowledged that, while it is true that some Kansas residents "are college students from other states or others, such as soldiers, who come to Kansas without the intent to remain indefinitely . . . it's hard to believe that those nondomiciliaries are collectively more than a drop in the bucket when it comes to class composition." *Id*. at 673-74. Regarding businesses, the Seventh Circuit acknowledged that "any out-of-state companies that purchase text messaging for Kansas cell phones used by their local employees and receive bills at a Kansas mailing address would be part of the class, but not Kansas citizens." *Id*. at 674. Even so, it said, "we imagine that only a fraction of businesses that use Kansas cell phone service are not Kansas citizens. All in all, we're inclined to think that at least two-thirds of those who have Kansas cell

phone numbers and use Kansas mailing addresses for their cell phone bills are probably Kansas citizens." *Id*. Despite recognizing all of this, the Seventh Circuit still reversed.

The Seventh Circuit described the above inferences as "[s]ensible guesswork, based on a sense of how the world works, but guesswork nonetheless." *Id*. It noted that, "[t]here are any number of ways in which our assumptions about the citizenship of this vast class might differ from reality." *Id*. It further noted that a majority of district courts have held "that a court may not draw conclusions about the citizenship of class members based on things like their phone numbers and mailing addresses." *Id*.

Although Plaintiffs acknowledged at oral argument that they could have easily met the first requirement of the local controversy by simply defining the class in terms of citizens rather than in terms of residents, they asserted that this would have later created complications for them at the class certification stage. In other words, Plaintiffs argue a de facto requirement of the local controversy exception to define the class in terms of citizens rather than residents would create an unfair dilemma for Plaintiffs. As everyone agrees, Plaintiffs' argument begins, an element in the test for citizenship is the intent to remain in the state. Given this, had Plaintiffs defined the class as citizens of New Mexico, Defendants at the class certification stage would argue that Plaintiffs must complete the Herculean task of demonstrating that each member of the putative class subjectively intends to remain in New Mexico. *See also* Doc. 35 at 6 (Plaintiffs' Reply argument that "[s]trictly requiring proof of domicile for all class members, including proof of 'intent to remain,' would inject complex individualized inquiries into every class action where the CAFA's 'local controversy' exception is at issue."). The Court does not now opine on whether, had Plaintiffs defined the class as citizens rather than residents, Plaintiffs would be required to complete such a Herculean task.

Instead, the Court notes that previous courts, aware of a class-representative plaintiff's requirements in class action litigation, have repeatedly stated that plaintiffs are the masters of their own complaint and suggested that plaintiffs seeking to demonstrate two-thirds citizenship for purposes of the local controversy exception simply could have defined the class as citizens of a state. *See e.g., In re Sprint Nextel Corp.*, 593 F.3d at 676 ("The plaintiffs might have defined their class as all Kansas *citizens* who purchased text messaging from Sprint Nextel or an alleged coconspirator. By using that definition, the plaintiffs could have guaranteed that the suit would remain in state court. There would have been no concern that out-of-state businesses, college students, soldiers, and the like comprised greater than one-third of the class, and it doesn't take any evidence to establish that Kansas citizens make up at least two-thirds of the members of a class that is open only to Kansas citizens."); *Nichols*, 718 F. App'x at 741 ("The need for this evidence [of citizenship] was Nichols' own making; he chose to define the class in terms of residence rather than citizenship . . . . By defining the class in terms of residence Nichols saddled himself with an evidentiary burden."); *Reece*, 638 F. at 774 ("We understand that evidence of class citizenship might be difficult to produce in this case. That difficulty, however, is to a considerable degree a function of the composition of the class designed by plaintiffs. The local controversy exception is designed to ensure that state courts hear cases of a truly local nature.") (quoting *Evans v. Walter Industries, Inc.*, 449 F.3d 1159, 1166 (8th Cir. 2006))).

The Seventh Circuit in *Sprint* also noted a different alternative for the plaintiffs in that case. It suggested plaintiffs

> might have submitted evidence that two-thirds of the class members were indeed Kansas domiciliaries or businesses. Given that there are probably hundreds of thousands of putative class members, if not more, it would be infeasible to document each class member's citizenship individually, but the district court could have relied on evidence going to the citizenship of a representative sample. This evidence might have included affidavits or survey responses in which putative class

members reveal whether they intend to remain in Kansas indefinitely, or, if they are businesses, their citizenship under the relevant test. Given those results and the size of the sample and the estimated size of the proposed class, the district court could then have used statistical principles to reach a conclusion as to the likelihood that two-thirds or more of the proposed class members are citizens of Kansas. Statisticians and scientists usually want at least 95 percent certainty, but any number greater than 50 percent would have allowed the district court to conclude that the plaintiffs had established the citizenship requirement by a preponderance of the evidence.

593 F.3d at 675–76 (internal citations omitted). As in *Sprint,* the Court has no statistical data before it. Because Plaintiffs define their class in terms of residents, not citizens, and because they present no other evidence to establish citizenship of the class members, the Court finds that they have not met their burden to show that greater than two-thirds of the class are citizens of New Mexico.[3]

Recognizing the possibility that the Court might reject its local controversy exception argument, Plaintiffs alternatively argue that the Court should give them the opportunity to conduct discovery as to the citizenship of the class members. Doc. 25 at 5 n.1. "'[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." *Kitts v. Cashco, Inc.*, No. 19-cv-800, 2020 WL 1553845, at *5-6 (D.N.M. Apr. 1, 2020) (quoting *Dietz v. Bouldin*, 136 S. Ct. 1885, 1892, (2016) (collecting cases where district courts exercised inherent authority in a variety of circumstances)). "This includes 'the inherent and legitimate authority . . . to issue process and

---

[3] Although the Court today issues the decision case precedent requires, it also recognizes that the decision embraces what appears to be a troubling double-standard. In situations like this, where defendants remove a CAFA case to federal court, defendants have the burden to establish the amount in controversy. To meet this burden, under *Hammond*, defendants are permitted to incorporate data related to individuals who are unlikely to meet the class definition. Where defendants provide no statistics or formula to rationally estimate how many of the individuals identified are likely to meet the class definition, the amount in controversy is based on guesswork. When the burden shifts to plaintiffs under the local controversy exception, however, guesswork is not good enough.

other binding orders, including orders of discovery . . . , as necessary for the court to determine and rule upon its own jurisdiction . . . .'" *Kitts*, 2020 WL 1553845, at \*5-6 (quoting *U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 79 (1988) (citation omitted)).

In considering Plaintiff's request, the Court recognizes that much of the information Plaintiffs would need to demonstrate citizenship is in one or both Defendants' possession. The Court further recognizes that Defendant APP removed the case to federal court soon after Plaintiffs filed it in state court and that, rather than entering a scheduling order for discovery, the Court has delayed entering a scheduling order pending resolution of the present motion to remand. Doc. 27. As a result, Plaintiffs have not had an opportunity to conduct discovery on the question of jurisdiction. These considerations militate in favor of allowing some limited discovery directed to the question of class citizenship.

On the other hand, the Court is mindful of the Tenth Circuit's admonition in *Hammond* that resolution of jurisdictional issues should not "bog[] [cases] down in mini-trials before they have even begun." *Hammond,* 844 F.3d at 913. "At this stage, we're just trying to decide the forum for the dispute, not liability or damages. And a more aggressive inquiry into the likelihood of success on the merits would invite delays and costs more appropriately reserved for adjudicating the merits than choosing the forum." *Id*. As Plaintiffs noted during oral argument, proof of citizenship creates a difficult burden because, unlike residency, citizenship considers a person's intent to remain in the State. Plaintiffs have not proposed a course of discovery that would allow them to obtain information they would need to establish citizenship without inviting delays and costs more appropriately reserved for adjudicating the merits than choosing the forum. Nonetheless, the Court is inclined to allow *limited* discovery and will allow Plaintiffs the

opportunity to submit to the referral judge a proposal for limited discovery on the question of citizenship. *See Kitts*, 2020 WL 1553845, at *6 (allowing expedited discovery and supplemental briefing before deciding the citizenship question). The referral judge may also set deadlines for supplemental briefing based on whatever discovery schedule the referral judge orders.

## CONCLUSION

For the reasons explained above, the Court takes Plaintiffs' Motion for Remand (Doc. 25) UNDER ADVISEMENT.

Because the Court has not yet determined if it should exercise subject matter jurisdiction over this matter, the Court will stay its ruling on Defendant Lovelace Health System, LLC's Motion to Dismiss for Failure to State a Claim and Motion to Strike Improper Class Definition (Doc. 11) until after the Motion to Remand is resolved.

_____
Steven C. Yarbrough
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent